**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE-OPELOUSAS DIVISION**

Glenn Gerard Brown                                  Civil Action No. 07-1230

versus                                                       Judge Tucker L. Melançon

Ocean Marine Contractors, Inc.,                Magistrate Judge C. Michael Hill
et al

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by defendants
Ocean Marine Contractors, Inc. and Gary Marceaux ("Ocean Marine") [Rec. Doc.
39], an Opposition to the motion filed by plaintiff, Glenn Gerard Brown [Rec. Doc.
51], an opposition to the motion filed by Manson Gulf, LLC ("Manson") [Rec. Doc.
53] and Ocean Marine's reply thereto [Rec. Doc. 57]. For the following reasons, the
motion will be denied.

### *I. Background*

This action involves a personal injury suit brought by plaintiff, Glenn Gerard
Brown against Ocean Marine, Ocean Marine's crane operator, Gary Marceaux,
Manson and Merit Energy Company ("Merit") arising out of an alleged accident that
occurred on August 9, 2006. Merit is the owner and operator of a braced caisson
platform designated as East Cameron Block 83, Platform "B" ("EC Block 83-B") that
was damaged during Hurricane Rita in September 2005. At the time of the alleged
accident, Brown was employed by Accurate NDE & Inspection, L.L.C., and was
providing welding inspection services on EC Block 83-B. On May 22, 2006, Manson
was awarded a contract to perform repairs to EC Block 83-B. *R. 39, Exh. C.* Under
the contract, Manson was responsible for providing "all personnel, vessels,

equipment, materials, facilities, consumables and the like as required and appropriate for carrying out the work." In 2003, Manson had subcontracted with Ocean Marine to supply additional labor to Manson. *01/02/03 Marine Master Work Contract.* In July 2006, Manson contacted Ocean Marine to provide additional labor to work aboard Manson's derrick barge, the D/B WOTAN, including a crane operator to operate the crane located on the WOTAN. On July 12, 2006, Ocean Marine's employee, Gary Marceaux, went to work on the WOTAN as a crane operator. *30(b)(6) Ocean Marine Depo. Bill McCarty, pp. 47-48.* Marceaux had earned his crane operator's certificate on July 11, 2006, one day prior to being sent to work on the WOTAN. *Id. at pp. 14-17, 37-40.* On August 9, 2006, plaintiff Glenn Gerard Brown, alleges he was injured when he was being transported in a work basket suspended from the crane on the WOTAN, to Merit's platform jacket. At the time of the incident, the crane was being operated by Marceaux.

It is undisputed that prior to the alleged accident, on August 3, 2006, while another crane operator was operating the crane, it went into a free-fall while unloading a 12,000 pound pump unit from a crew boat. *R. 39; 53, Uncontested Fact # 6.* Manson determined that the crane's elliptical cam for the braking system was broken and needed to be replaced. *Id., #7.* Manson decided that until the new elliptical cam was installed, the crane would continue to be operated, but in "Vicon mode" only.[1] *Id., #8.* Manson's barge superintendent, Clyde Cobb, was ordered to

---

[1] Vicon enables the operator to use boom and swing machinery from independent power sources without the use of clutch or brakes. *R. 39, p. 3.*

conduct a safety meeting to instruct everyone on the barge that the crane was to be operated in Vicon mode only. *Id., #9.* Manson has no record that Cobb ever addressed the issue at a safety meeting as instructed, and that such record should exist if he had done so. *Id., # 10.* There is no evidence that Marceaux had any knowledge that the crane was to be operated in Vicon mode only. *Id., #11.* Manson's Safety Manager, Jim Powers, admitted that the crane should have been taken out of service until the replacement parts for the brakes were installed. Powers further admitted that doing personnel transfers with the crane in this condition was "inherently dangerous." *Id., #12.* It is undisputed that at the time of the alleged incident, Marceaux had agreed to work a second consecutive 12-hour shift. *R. 39, 53.* Manson admits that only Alan Tompkins, its manager of offshore Operations, had the authority to allow anyone on the D/B WOTAN to work in excess of 12-consecutive hours and that Tompkins never gave permission to anyone on the barge to allow Marceaux to work an extra shift. *Id., #17.* It is a violation of Manson's policy to have either an employee or contractor work two consecutive 12-hour shifts. *Id.,#18.* The replacement parts for the crane's brakes had not been installed when the incident at issue is alleged to have occurred. *Id., # 22.*

Brown filed suit contending that Ocean Marine is liable for his injuries due to its own negligence and the negligence of its employees. Ocean Marine filed the present motion seeking to have this Court declare that plaintiff was the borrowed employee of Manson and that, as such, Ocean Marine is immune from tort liability under the Longshore and Harbor

Workers' Compensation Act (the "LHWCA"), 33 U.S.C. §§ 901, *et. seq.*[2]

## II. Summary Judgment Standard

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)(en banc). Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id.* If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however, the burden shifts to the non-moving party to show that there is a genuine issue for trial.[3] *Id.* at 322-23.

Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that

---

[2] In plaintiff's opposition to Ocean Marine's motion, plaintiff maintains that the motion for summary judgment for a complete dismissal of Ocean Marine and Marceaux is premature because plaintiff has alleged liability on the part of Ocean Marine on other grounds besides vicarious liability as well as personal liability on the part of Marceaux.

[3] Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the non-moving party of these essential elements renders all other facts immaterial. *Id.* at 322.

there is a genuine issue of material fact requiring a trial. *Celotex Corp.*, 477 U.S. at 324; Fed.R.Civ.Pro. 56(e). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144. 159 (1970); *Little*, 37 F.3d at 1075. There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson*, 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.*, 958 F.2d 95, 97 (5th Cir. 1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990).

If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

### III. Analysis

Generally, the question of borrowed employee status is a question of law for the court to determine. *Billizon v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir. 1993). In some cases, however, factual disputes must be resolved before the district court can make a legal determination. *Id. (citing Brown v. Union Oil Co. of California*, 984 F.2d 674, 679 (5th Cir.

1993) *and Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 n. 13 (5th Cir. 1988), *reh'g granted on other grounds*, 841 F.2d 572 (5th Cir. 1988)). Here, Ocean Marine alleges that no genuine issue of material fact exists regarding Marceaux's status as a borrowed employee of Manson and, therefore, summary judgment is appropriate. In support of this position, Marceaux points to the United States Fifth Circuit Court of Appeal case of *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312 (5th Cir. 1969). There, the Court identified nine factors that must be considered in determining borrowed employee status in the context of the LHWCA. These factors are:

(1)  Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2)  Whose work is being performed?

(3)  Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4)  Did the employee acquiesce in the new work situation?

(5)  Did the original employer terminate his relationship with the employee?

(6)  Who furnished tools and place for performance?

(7)  Was the new employment over a considerable length of time?

(8)  Who had the right to discharge the employee?

(9)  Who had the obligation to pay the employee?

*Brown*, 984 F.2d at 676 (*citing Ruiz*, 413 F.2d 310).

While the Fifth Circuit has held that no single *Ruiz* factor is determinative, when the LHWCA is used as a defense to tort liability, the principal focus within the *Ruiz* test is: "(1) was the second employer itself responsible for the working conditions experienced by the employee, and the risks inherent therein, and (2) was the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks

of the work situation and acquiesced thereto[.]" *Gaudet v. Exxon Corp.*, 562 F.2d 351, 357 (5th Cir. 1977); *See Also Billizon*, 993 F.2d at 106; *Brown*, 984 F.2d at 676; *Melancon*, 834 F.2d at 1245.[4] These factors are considered the most important when the borrowed employee doctrine is used as a defense to tort liability because they deal with the question of whether the circumstances of the employee's employment are such that the defendant "should be considered an employer and not a third party under the LHWCA." *Gaudet*, 562 F.2d at 357. With this focus in mind, if, after considering each of the *Ruiz* factors, ". . . sufficient basic factual ingredients are undisputed, the court may grant summary judgment." *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 617 (5th Cir. 1986), *cert. denied* 479 U.S. 838 (1986).

### 1. Control

In support of its motion, Ocean Marine contends that Manson admits it directed and supervised all of the work on its derrick barge. The record indicates that Clyde Cobb, Manson's barge superintendent, was at the head of the chain of command on the barge and that there were no Ocean Marine supervisors on board the D/B WOTAN at any time. Ocean Marine also contends that Manson admits it was Manson's decision to have Marceaux operate its crane with the braking system problems as well as not to use the walkway on the barge to transport personnel to the well jacket. Ocean Marine asserts that Manson required Marceaux to attend its safety meeting prior to every shift he worked during which Manson instructed its employees and contractors on the specific work it wanted performed during their shift. Manson set the shifts of all workers on its barge at 12 hours. It was a violation of Manson's company policy to have either an employee or contractor work two consecutive

---

[4] In other cases, the first factor, control, has been considered the central, though not solely determinative, issue of borrowed employee status. *Melancon*, 834 F.2d at 1245; *see also Hebron v. Union Oil Co. of California*, 634 F.2d 245 (5th Cir. 1981). In either event, the Court will examine each of the *Ruiz* factors in this case and make its determination based on the totality of the circumstances.

12-hour shifts.

In their oppositions to Ocean Marine's motion, Manson and plaintiff maintain that a material issue of fact exists as to whether Ocean Marine had control over Marceaux and the work he was performing. Manson cites the following undisputed testimony by Marceaux: "(i) before Marceaux made a lift in the crane there were never any meetings between Manson and himself regarding how the load was to be lifted; (ii) Manson's deck foreman only gave Marceaux hand signals (during the day) and radio signals (at night) regarding load movements; (iii) Marceaux's job in the crane was simply to operate it, and Manson never required Marceaux to perform crane inspections or maintain the crane; (iv) for the personnel load at issue involving plaintiff, there was no pre-lift meeting between Marceaux and Manson, and Marceaux does not recall even a Manson deck foreman being present at the time to give him any signals; (v) Marceaux testified that whenever he was on duty but not operating the crane, he was 'on break,' and he was not required by Manson to do any other work, he could go to the bathroom, get something to eat or drink, or simply sit in the crane cabin; and (vi) Marceaux testified he did not have to work the second consecutive shift at issue and could have told Manson 'no,' but he wanted to make extra money." *R. 53, Marceaux Depo.,p p. 155-57.*

Moreover, Manson cites Marceaux's testimony which it contends create genuine disputes of material fact: (1) Marceaux has been an employee of Ocean Marine since October 2004; (2) Marceaux, who Ocean Marine provided to Manson, testified he was totally unaware of ANSI, API and/or ASME crane operation regulations; (3) Ocean Marine rather than Manson trained Marceaux; (4) Before he made a personnel lift on the WOTAN using the crane, including the one at issue, Marceaux testified that there was no meeting between himself and any Manson personnel member regarding how the lift was to be performed, so

8

he made the decision himself; (5) Marceaux's formal crane operator training was arranged for and paid by Ocean Marine and came during a one-day course on July 11, 2006, the day before he went to work on the WOTAN; (6) While on the WOTAN, Marceaux followed Ocean Marine's company policies and he alone could stop the job if he felt it was unsafe.

Based on the foregoing undisputed testimony, indulging every reasonable inference from those facts in favor of the party opposing the motion, the Court finds there are genuine issues of material fact as to whether or not Manson had control over Marceaux and the work he performed on the WOTAN.

## 2. Whose work was being performed?

Ocean Marine contends that "[t]here is no question that Marceaux was performing the work of Manson while operating the crane on the D/B WOTAN." *R. 39*. Ocean Marine cites the deposition testimony of Manson's Manager of Offshore Construction and Manson's 30(b)(6) corporate representative, Alan Tompkins, stating that, "all work and operations performed by Ocean Marine Contractors and its employees pursuant to the agreement that it has with Manson are an integral part of and are essential to the ability of Manson to generate Manson's goods, products and services." *R. 53, Exh. A, pp. 378-380*.

Manson argues that on the date of the accident, Marceaux was working aboard the WOTAN, which was owned by Manson. Manson had been contracted to provide the tools and labor for repair of Merit's well jacket. Manson subcontracted with Ocean Marine to provide fully trained personnel who were capable of operating such equipment and performing marine related services for Manson. *R. 53, Depo. Of Ocean Marine Vice President, McCarty, pp. 12-13; Depo. Of Ocean Marine President, Cheramie, pp. 10-11.* Manson asserts that it is not yet determined whether Marceaux was performing Ocean Marine's work for Manson, Manson's work for Merit, or whether he was working as an

Ocean Marine employee for a Merit project. Manson, cites Louisiana state jurisprudence in support of its contention that courts have recognized that crane operators who were performing their usual work, were performing their own crane operator "work" and not the "work" of the hiring party. *R. 53, citing Bertrand v. Howard Trucking Co., Inc.* 427 So.2d 40, 43 (La.App. 3 Cir.,1983); *Leblanc v. Roy Young, Inc.*, 308 So.2d 443 (La.App. 3 Cir.,1975; *Nichols Construction Corp. v. Spell*, 315 So.2d 801 (La.App. 1 Cir. 1975). Giving every inference to plaintiff as the non-moving party, there are outstanding issues of fact as to whose work Marceaux was performing.

### 3. Agreement between the employers

There is no question that the Contract between Manson and Ocean Marine provided that Ocean Marine's employees were independent contractors. The Contract set forth in Paragraph 14(a) states:

> The actual performance and superintendence of all work hereunder shall be by Contractor [Ocean Marine], but Manson and it representative shall have unlimited access to the operations to determine whether work is being performed by Contractor in accordance with the provisions of this Agreement . . . Contractor shall be an independent contractor with respect to the performance of all work hereunder, and neither Contractor nor anyone employed by Contractor shall be deemed for any purpose to be the employee, agent, servant or representative of Manson in the performance of any work or service or part thereof in any manner dealt with hereunder. Manson shall have no direction or control of the Contractor or its employees and agents except with respect to the results to be obtained.

*R. 53, Exh D, Contract, p. 4.*

While the Fifth Circuit has held that, in determining borrowed employee status, the parties' actions in carrying out a contract can provide an implied modification or waiver of a contrary express provision, *see, Brown*, 984 F.2d at 677; *Melancon*, 834 F.2d at 1245, the evidence before the Court is unclear whether Manson or Ocean Marine controlled Marceaux and the work he performed. Thus, it is also unclear whether or not the contract further prohibits a

finding of borrowed employee status. *See, Alday v. Patterson Truck Lines, Inc.*, 750 F.2d 375, 378 (5th Cir.1985) (a contractual provision [such as Paragraph 14(a)] creates an issue of material fact on the borrowed servant issue).

### 4. Acquiescence

"The focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them." *Brown*, 984 F.2d 674, 678 (5th Cir. 1993). More specifically, "was the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto[.]" *Gaudet v. Exxon Corp.*, 562 F.2d 351, 357 (5th Cir.1977). Ocean Marine asserts that Marceaux clearly understood that when he went to work on the WOTAN he would be working for Manson and under Manson's direction, control and supervision. Manson contends that a material issue of fact exists concerning Marceaux's acquiescence to his working conditions. In particular, Manson argues that Marceaux's testimony reveals that he had never worked offshore before, and therefore, he did not appreciate the potential dangers associated with working on the WOTAN. *R. 53, Marceaux Depo., p. 230.* Moreover, the parties do not dispute that Marceaux was not familiar with the crane he was operating, was not aware that the crane was to be operated in VICON mode and was not aware that the crane might be in need of repair. *Id. at p. 18 55; R. 53, p. 27.* Finally, Manson argues that because Marceaux worked aboard the WOTAN for a total of only 14 days, he did not truly understand and/or acquiesce in his new work situation. The Court finds that there are genuine issues of material fact as to whether or not plaintiff acquiesced to his work situation on the WOTAN.

### 5. Termination

A finding of borrowed employee status does not require that the lending employer

11

completely sever its relation with the employee. *Melancon*, 834 F.2d at 1238; *Capps*, 784 F.2d at 617-18. The focus, instead, is on the lending employer's relationship with the employee while the borrowing occurs. *Capps*, 784 F.2d at 617-18. Ocean Marine asserts that this factor weighs in favor of borrowed employee because Ocean Marine had no control over Marceaux or his work. Manson argues, however, that Ocean Marine retained authority to call Marceaux "back in" should they require his services elsewhere. As the Court has previously found that issues of material fact exist as to whether Ocean Marine or Manson had control over Marceaux and the work he performed, there are also issues of material fact related to this factor.

### 6. Tools and Place of Performance

Manson does not dispute that this factor weighs in favor of borrowed employee status.

### 7. Length of Employment

The Fifth Circuit noted in *Capps* that "[w]here the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however the converse is not true." *Capps*, 784 F.2d at 616-17. Marceaux worked aboard the WOTAN for a total of only 14 days as of the date of the alleged accident. Considering the pertinent jurisprudence, this factor is at best neutral. *Id.* at 618; *Brown*, 984 at 678.

### 8. Right to Discharge

Ocean Marine states, "It is undisputed that Manson not only had the right to terminate Marceaux's services but it exercised that right." Ocean Marine cites the deposition testimony of Manson's 30(b)(6) corporate representative, Tompkins, who testified that Manson's barge superintendent, Clyde Cobb, ordered Marceaux out of the crane cab then instructed him to leave the barge. *R. 39, Exh. F, Manson's 30(b)(6) Depo., pp. 100-01, 108-09; Marceaux Depo, pp. 104, 132-34.*

12

Manson argues that Merits' Supervisor's Accident Investigation Report, Merit's Coast guard Report of Marine Accident, Injury or Death and Merit's August 24, 2006 correspondence to the Minerals Management Service, indicate that Merit and/or Bob Hoffpair, Merit's contractor who oversaw the offshore operations for Merit, either terminated or sought the termination of Marceaux. While the record is confused as to Merit's role in Marceaux's termination, it is clear that Manson's supervisor, Cobb, "instructed" Marceaux to leave the crane and effectively terminated his services on the WOTAN. The record is also clear that only Ocean Marine had the ability to fire Marceaux from his employment with Ocean Marine. *Marceaux Depo., p. 174.* The Fifth Circuit has found that "[t]his arrangement is sufficient to support a finding of borrowed employee status." *Brown*, 984 F.2d at 679 (citing *Melancon*, 834 F.2d at 1246 and *Capps*, 784 F.2d at 618). As such, this factor weighs in favor of borrowed employee status.

### 9. Obligation to Pay

Manson does not dispute that this factor weighs in favor of borrowed employee status.

### *IV. Conclusion*

After weighing the *Ruiz* factors in this case, the Court finds that the factual showing thus far adduced does not so unequivocally point to a borrowed employee relationship as to permit a summary judgment. Accordingly, Ocean Marine's Motion for Summary Judgment [Rec. Doc. 39] will be denied.